UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:16-cr-00251-TWP-MJD |
| | ) |
| JUAN ZAMUDIO (02), | ) |
| | ) |
| Defendants. | ) |

**ENTRY ON MOTION TO SUPPRESS**

This matter is before the Court on Defendant Juan Zamudio's Motion to Suppress. ([Filing No. 745](#).) Juan Zamudio is charged in Count One: Conspiracy to Possess with Intent to Distribute and to Distribute Controlled Substances; Count Six: Possession with Intent to Distribute Controlled Substances; Count Seven: Illegal Alien in Possession of a Ammunition; and Count Thirteen: Conspiracy to Launder Monetary Instruments. He petitions this Court to suppress any and all items seized pursuant to a search warrant, from his residence at 64 N. Tremont Street, Indianapolis, Indiana ("64 N. Tremont"). For the reasons set forth below, Juan Zamudio's Motion to Suppress is **granted**.

## I. BACKGROUND

The FBI began an investigation into Jose Zamudio's Drug Trafficking Organization ("DTO") in February of 2016 and culminated in the FBI receiving judicial authorization to intercept ten different cellular phones, including a phone utilized by Jose Zamudio. ([Filing No. 762 at 2](#).) As part of the investigation, the Government intercepted phone calls between Jose Zamudio and various other individuals in the DTO including his brother, Juan Zamudio. *Id.* Agents performed surveillance on a number of individuals believed to be in Jose Zamudio's DTO.

*Id.* On November 14, 2016, the Government applied for a search warrant that requested judicial authorization to search numerous locations, including Juan Zamudio's residence at 64 N. Tremont, Indianapolis, Indiana. *Id.* The Application and Affidavit for the Search Warrant was 125 pages long and sought the search of 34 separate locations. ([Filing No. 762-1](Filing No. 762-1).) The Magistrate Judge approved the Application for a Search Warrant that same day. During execution of the search warrants, agents located approximately 11,405 grams of pure methamphetamine at 64 N. Tremont, Indianapolis, Indiana.

Juan Zamudio's role in the DTO is explained in the Search Warrant application. The parties both cite to three specific incidents in the Affidavit that connect Juan Zamudio to drug trafficking. On October 27, 2016, police surveillance observed co-defendants Jeremy Perdue ("Perdue") and Jeffrey Rush ("Rush") enter Jose Zamudio's house on 1126 South Auburn Street, Indianapolis, Indiana, at 11:41 a.m., and exit a few minutes later. ([Filing No. 762 at 3.](Filing No. 762 at 3.)) At approximately 1:00 p.m., that same day, Rush, Perdue, and Joseph Coltharp ("Coltharp") met at a Long John Silver's restaurant in Indianapolis. ([Filing No. 762-1 at 81.](Filing No. 762-1 at 81.)) Just after the meeting, Coltharp was stopped by an Indianapolis Metropolitan Police Department ("IMPD") officer, after he committed a traffic violation. *Id.* at 82-83. The IMPD officer located a package of narcotics on the floorboard of the passenger side of the vehicle, which was later determined to be 852 grams of pure methamphetamine. Cell phone pings from Perdue and Juan Zamudio's cell phones showed both individuals in the area of Juan Zamudio's place of employment, which is a tire shop across the street from the Long John Silver's restaurant. The Affidavit reveals an intercepted telephone call between Jose Zamudio and Juan Zamudio:

> Juan:  I have the guys here, they're done.
> Jose:  Did they leave you the fifteen?
> Juan:  Yes. Look, um the guy was telling me right now for you to have the house dark, because the dogs were following them.

([Filing No. 762-1 at 83-84](#)).  The Government explains that this conversation meant that Rush and Perdue met with Juan Zamudio for a drug transaction, and reported they had been followed by law enforcement from Jose Zamudio's house that morning.  ([Filing No. 762 at 4](#).) The drug activity on this date took place at Jose Zamudio's house on 1126 South Auburn Street and the Long John Silver's restaurant near Juan Zamudio's place of employment.

The second, and more significant act attributed to Juan Zamudio occurred on October 20, 2016.  Officers were conducting surveillance on Juan Zamudio, Perdue, and Rush.  *Id.* at 4.  Co-defendant David Silnes is also observed in the activity.

> Later that day on October 20, 2016, PERDUE and RUSH took part in the purchase of two pounds of methamphetamine from Juan ZAMUDIO and delivered methamphetamine to SILNES. Surveillance officers that day were conducting surveillance on PERDUE, RUSH, and Juan ZAMUDIO as a result of intercepted telephone calls over Target phones 8 and 9. At approximately 1:44 p.m. on October 20, 2016, Jose ZAMUDIO called Juan ZAMUDIO at Target Phone 8. In this call Jose Zamudio stated, "Can you put in a call to the white guy? Tell him that if he needs something, for him to, to call you (Juan ZAMUDIO should call RUSH and explain to RUSH that he is to call Juan ZAMUDIO when he needs to purchase methamphetamine)." At approximately 1:47 p.m., on October 20, 2016, Juan ZAMUDIO sent an outgoing test to RUSH, at TARGET Phone 9, utilizing Target Phone 8. This text message stated, "Primo sed if you. Need call me bro [sic] (RUSH should call Juan ZAMUDIO rather than Jose ZAMUDIO when Rush needs to purchase methamphetamine)." At approximately 6:20 p.m., on October 20, 2016, RUSH, utilizing Target Phone 9, sent an outgoing text to Juan ZAMUDIO at Target Phone 8. This text message, in part, stated, "Yeah I need two (RUSH wished to purchase two pounds of methamphetamine from Juan ZAMUDIO." At 7:40 p.m. Juan ZAMUDIO responded to RUSH, "Meet me at Kroger."  At 7:42 p.m. RUSH responded, "Ok we are here (RUSH and PERDUE had both arrived at Kroger to pick-up the two pounds of methamphetamine)." Subsequently, at 7:42 p.m. on October 20, 2016, surveillance officers observed RUSH exist an unknown Chevy Pickup truck, and enter Juan ZAMUDIO's Chevy Trailblazer.  A short time later RUSH exited Juan ZAMUDIO's vehicle, in possession of a basketball sized red box, and reentered the passenger seat of the pickup. Surveillance officers followed the pickup truck away from the scene, and observed it travel directly to David SILNES' resident at 732 South Norfolk Street, Indianapolis, Indiana.  Surveillance officers observed RUSH exist the passenger side of the pickup carrying the same red box he was observed exiting Juan ZAMUDIO's vehicle with, and also observed PERDUE exit the driver's door of the pickup, and enter SILNES' residence. I

believe that PERDUE and RUSH were in the process of delivering methamphetamine to SILNES during this surveillance.

([Filing No. 762-1 at 85-86](#).).  The drug activity involving Juan Zamudio on this date took place in his Chevy Blazer automobile and at the Kroger store parking lot.

The third incident involved Co-defendant Adrian Bennett, Jose Zamudio, and Juan Zamudio. The Government describes this incident in its Response.

> On November 3, 2016, Bennett called Jose Zamudio, but Juan Zamudio answered the phone. Bennett and Juan Zamudio then discussed if Jose Zamudio had received his shipment of marijuana. Bennett then told Juan that he had "some change (drug proceeds) for him, and also that he needed, "more of his usual (more controlled substances)." Bennett then stated that he needed "some ice cream (methamphetamine)." Juan Zamudio was then heard relaying that information to Jose Zamudio, and then Juan Zamudio told Bennett if he wanted to "swing by there (Jose ZAMUDIO's residence), they are there." Bennett then stated that he would be at Jose Zamudio's residence in an hour.

([Filing No. 762 at 5](#)) (internal citations omitted).  The drug activity surrounding this incident took place at Jose Zamudio's residence. The Affiant states that based on his training and experience, he is aware that drug traffickers generally store their drug-related paraphernalia in their residence or the curtilage of their residences.  ([Filing No. 762-1 at 111.](#))

## II. <u>LEGAL STANDARD</u>

The Fourth Amendment provides,

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.  "If the search or seizure was effected pursuant to a warrant, the defendant bears the burden of proving its illegality."  *United States v. Longmire*, 761 F.2d 411, 417 (7th Cir. 1985).  In reviewing the issuance of a search warrant:

4

> a magistrate's determination of probable cause…should be overruled only when the supporting affidavit, read as a whole in a realistic and common sense manner, does not allege specific facts and circumstances from which the magistrate could reasonably conclude that the items sought to be seized are associated with the crime and located in the place indicated.

*United States v. Norris*, 640 F.3d 295, 300 (7th Cir. 2011) (quoting *United States v. Spry*, 190 F.3d 829, 835 (7th Cir. 1999)). Instead of focusing on technical aspects of probable cause, the reviewing court should consider all facts presented to the magistrate. *United States v. Lloyd*, 71 F.3d 1256, 1262 (7th Cir. 1995). And "[w]here the police have acted pursuant to a warrant, the independent determination of probable cause by a magistrate gives rise to a presumption that the arrest or search was legal." *Id.* Probable cause affidavits supporting applications for warrants are to be "read as a whole in a realistic and common sense manner," and "doubtful cases should be resolved in favor of upholding the warrant." *United States v. Quintanilla*, 218 F.3d 674, 677 (7th Cir. 2000) (citation omitted). A judge determines probable cause exists to search when the "known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found." *Ornelas v. U.S.*, 517 U.S. 690, 696 (1996) (citations omitted). "When a search is authorized by a warrant, deference is owed to the issuing judge's conclusion that there is probable cause." *U.S. v. Sutton*, 742 F.3d 770, 773 (7th Cir. 2014). Moreover, where "an affidavit is all that was presented to the issuing judge, the warrant's validity rests on the strength of the affidavit." *Id*.

### III. DISCUSSION

**A.** **Probable Cause**

Juan Zamudio moves to suppress the evidence seized from the search of his residence on November 17, 2016. ([Filing No. 745](#).) He asserts that the four corners of the Affidavit provided no probable cause to support an objective belief that 64 N. Tremont contained evidence of a crime.

5

([Filing No. 745 at 11](#).) Specifically, he contends that being suspected of drug trafficking miles away from his home, with no allegations that he left his home, returned to his home or conducted any drug trafficking activity at or even near his home, does not lead to a reasonable belief that evidence of drug trafficking would be found at his residence. ([Filing No. 745 at 10](#).) The Government responds that, while nexus must exist between the crime alleged and the place to be searched, probable cause does not require direct evidence linking a crime to a particular place. ([Filing No. 762 at 6](#).) The Government contends that the issuing judge could draw reasonable inferences that evidence is often found at the residences of suspected drug traffickers, such as Juan Zamudio. *Id.* "On the issue of nexus, [p]robable cause does not require direct evidence linking a crime to a particular place. Instead, issuing judges are entitled to draw reasonable inferences about where evidence is likely to be found given the nature of the evidence and the type of offense. In the case of drug dealers, evidence is often found at their residences." *United States v. Wiley,* 475 F.3d 908, 916 (7th Cir. 2007) (quoting *United States v. Anderson*, 450 F.3d 294, 303 (7th Cir. 2007).

    Juan Zamudio argues that there is a factual distinction in his case and the cases which support the proposition that participation in drug trafficking activity provides an inference for a magistrate to find probable cause to search a defendant's home.

    In *United States v. Lamon,* 930 F.2d 1183, 1188 (7th Cir. 1991) the Seventh Circuit found probable cause existed to search a suspects second home, undisputedly unconnected to any drug activity, on the basis of information gathered for probable cause relating to a *first home which was used to sell drugs* out of to a reliable confidential informant. *Id.* The second home was the defendant's primary home, and the first home was his part-time home. An informant indicated that the defendant only sold drugs out of the first (part-time) home. The Seventh Circuit held

because evidence had already seized from the first home, and in the detective's experience drug dealers often hide money, drugs, and other incriminating evidence at their permanent homes, the affidavit provided a substantial basis for probable cause. *Id.* at 1190.

In *United States v. Feliz,* 182 F.3d 82 (1st Cir.1999), the court overturned the district court's determination of no probable cause to search the suspect's home, where substantial information had been presented that the suspect was engaged in illegal drug trafficking and no other drug-dealing headquarters was identified in the affidavit. *Id.* at 87–88. The court reasoned that probable cause to search a home in drug cases often will rest not on direct observation, but rather "can be inferred from the type of crime, the nature of the items sought, the extent of an opportunity for concealment and normal inferences as to where a criminal would hide" evidence of the crime in question. *Id.* at 88.

In *United States v. Reddrick,* the search warrant for a home was obtained based on information from a confidential informant who told police that he had seen about 13 kilograms of cocaine inside of the defendant's residence. 90 F.3d 1276, 1278-79 (7th Cir. 1996). The confidential informant, had been used previously, and was known to be reliable. Quoting the Supreme Court in *Zurcher v. Stanford Daily,* 436 U.S. 547, 557 (1978), the Seventh Circuit noted, "[t]he critical element in a reasonable search is not that the owner of the property is suspected of crime but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought." *Reddrick,* 90 F.3d at 1281. Ultimately, the *Reddrick* court held that while the confidential informant's information regarding the amount of cocaine he saw in the defendant's residence would not be enough for probable cause to search the house alone, testimony concerning three controlled buys (which tended to show the defendant was a drug dealer), combined with the informant's information was enough to support

issuance of a search warrant. *Id. Reddrick,* thus was not a case that concerned a search warrant based on a defendant's status alone as an alleged drug dealer; rather, there was also indirect information which linked the drug dealing activity to the defendant's residence.

Juan Zamudio argues that in this Circuit, there is no categorical rule that being a drug dealer alone, is sufficient to evidence to establish probable cause for the search of the drug dealers home. "We agree with the district court that it would be inappropriate to adopt a categorical rule that would, in every case, uphold a finding of probable cause to search a particular location simply because a suspected drug trafficker resides there." *United States v. Wiley,* 475 F.3d 908, 916 (7th Cir. 2007).

> We do not read either *Lamon* or *Feliz* as holding flatly that there is always probable cause to search a drug dealer's home, merely because there is probable cause to believe that he or she is engaged in drug trafficking. The facts of a particular case may indicate, for example, that the dealer uses a "safe house" or another participant's property for all of his drug-related business, perhaps to keep information about his activities from others in the home. As usual, the inquiry is highly fact-specific.

*United States v. Walker*, 145 F. App'x 552, 555 (7th Cir. 2005) (unpublished).

Juan Zamudio argues that the Affidavit regarding his drug activities does not involve his residence[1] and relies on nothing more than his alleged status as a drug trafficker. (Filing No. 745 at 10.) The Government has not responded directly to Juan Zamudio's argument that the Affidavit does not contain one single averment that Juan Zamudio kept, dealt, or distributed anything from his home or even near his home. (Filing No. 745 at 13.) Rather, the Government bases its argument that the search was based on probable cause due to the fact that issuing judges are entitled

---

[1] Juan Zamudio concedes that *Lamon* is reasonable under its facts; that having been caught with drugs in your residence, whether secondary or primary, would lead to the reasonable belief that drugs are in the other residence as well. (Filing No. 745 at 10.)

8

to draw reasonable inferences (in this case that drugs are likely to be found where drug dealers live) ([Filing No. 762 at 6-7](Filing No. 762 at 6-7)).

*U.S. v. McNeal* 82 F. Supp.2d 945, 956 (S.D. Ind. 2000), is instructive considering the facts of this case.

> Perhaps it may be understood by a judge's common sense that a drug dealer, like any other criminal, might use his/her home as a storage place for illegal proceeds and contraband separate from the drugs themselves. A fatal flaw in this concept, though, is that nothing in the affidavit places McNeal (or anyone else connected with the drug activity, for that matter) at (or even near) 7150 N. Lakeside Drive before, during or after the drug transactions. The affidavit merely attributes control of the property to McNeal, not presence at the location.

*Id*. In *McNeal*, the district court granted a motion to suppress where the affidavit for probable cause did not contain any information that placed the defendant or any of his operatives at the residence that was searched at any time. *Id.* Similar to *McNeal*, there is absolutely no evidence linking Juan Zamudio's presence or his drug dealing activity to 64 N. Tremont.[2] Because the Affidavit fails to establish a reasonable nexus between Juan Zamudio's alleged criminal drug activity and 64 N. Tremont, a fair probability that contraband would be found at 64 N. Tremont does not exist.

In addition, to the lack of evidence linking his alleged drug activity to his residence, Juan Zamudio asserts that the Affidavit contains other facts that negate an inference supporting probable cause. Specifically, he argues that the cases which found probable cause based on a defendant's alleged status as a drug trafficker are diminished when one looks at the facts raised in the affidavit.

> According to the Affidavit, Juan distributed drugs at the direction of Jose Zamudio. *See* Affidavit, ¶ 121. And each time an instance of Juan being involved in drugs is mentioned, it directly ties back to Jose Zamudio and his home at 1126 South Auburn Street. Thus, the force of those cases *are* diminished, because if Juan's drug trafficking activities are limited to distribution of drugs at Jose's behest, and each instance the affiant gave the magistrate to consider tied directly to Jose's home,

---

[2] Juan Zamudio argues that the only nexus between him and 64 N. Tremont (the place to be searched) was that "Juan lives there." ([Filing No. 745 at 13](Filing No. 745 at 13).)

9

> there is not a reasonable probability that a drug mule would store product at his home.

([Filing No. 777 at 2](Filing No. 777 at 2)) (emphasis in original).

Here, the Affidavit supports the proposition that Jose Zamudio's home was the drug-dealing headquarters. In their Response, the Government repeatedly refers to Jose Zamudio's residence as the residence where many drug transactions occurred. While Juan Zamudio is alleged to have picked up money for Jose Zamudio at a Long John Silver's restaurant, and selling drugs (at the direction of Jose) in a Kroger parking lot, these acts provide no nexus to Juan Zamudio's residence. Instead, most of the drug-related activity occurred at Jose Zamudio's home, and none of it is alleged to have occurred at Juan Zamudio's home. Intercepted wiretaps and police surveillance confirm that 1126 South Auburn Street is the residence where methamphetamine dealings occurred. None of Juan Zamudio's drug related activities are alleged to have occurred at his residence, rather they are alleged to have occurred in public places.

*U.S. v. Walker* is also instructive. In that case, the DEA agent's assertion that drugs or evidence of drug dealing was likely to be found in Walker's home rested solely on what the agent knew from training and experience, namely, that "drug traffickers generally store their drug-related paraphernalia in their residences." 45 Fed. Appx. at *555. The *Walker* court determined there was probable cause based on the DEA agent's assertion and the defendant's status as an alleged drug trafficker. The court noted that its ruling "was close to the edge" and that a different result might be warranted dependent on facts that show a hint that another location is used for the participant's drug-related business. *Id.* at *555-56. Here, similar factual averments are presented, however, this case crosses the explicit hypothetical edge posed by the Seventh Circuit in *Walker*. Not only does the Affidavit confirm that another location/residence was used for the drug trafficking activities, but the Government's Response makes repeated references to drug trafficking activities

occurring at Jose Zamudio's home. (*See* [Filing No. 762 at 3-6](Filing No. 762 at 3-6).) The fact that Jose Zamudio's home was used as the drug-dealing headquarters distinguishes this case from other cases finding probable cause solely based on the fact that the defendant is an alleged drug trafficker. There is absolutely no evidence (other than the Affiant's statement that drug dealers keep evidence where they live) linking Juan Zamudio's alleged drug activity with the 64 N. Tremont address. In all of the cases cited by the parties, in addition to alleging that the defendant was a drug dealer, there was some other nexus connecting the defendant to the property searched—either a confidential informant reported activity at the residence; or through surveillance drug related activity was observed at the residence; or there was no hint of any other location where defendant would keep materials related to his drug dealings and therefore, it was logical to infer that such materials existed at the defendants residence. Because the Affidavit contained no nexus between Juan Zamudio's alleged drug activities and 64 N. Tremont, and the Affidavit alleges that all of Juan Zamudio's drug related activity either took place at Jose Zamudio's residence or in public locations, probable cause does not exist to support the search warrant for his home.

**B**.    **Good Faith Exception**

Juan Zamudio asserts that the good-faith exception does not apply in this case because there was no substantial basis for the Magistrate Judge to have concluded that probable cause existed, and given the substantial deficiencies, a reasonably well-trained officer would have known that the search was illegal, despite the search warrant being issued. ([Filing No. 745 at 13](Filing No. 745 at 13).) The Government did not respond to this argument.

> The good faith doctrine does not apply if: (1) the magistrate issuing the warrant abandoned his detached and neutral role; (2) the officers were dishonest or reckless in preparing the affidavit for probable cause; (3) the affidavit is "so lacking in indicia of probable cause" that an officer's belief in its existence is entirely unreasonable; or (4) the warrant is so facially deficient that the executing officers cannot reasonably presume it to be valid.

11

*United States v. McNeal,* 82 F. Supp. 2d 945, 961 (S.D. Ind. 2000) (citing *United States v. Leon,* 468 U.S. 897, 923-26 (1984). Juan Zamudio argues that the Affiant made knowing and recklessly false statements in the Affidavit for probable cause. While the Court does not believe that the Affidavit contains knowing and recklessly false statements, it is concerning that the Affidavit at times confuses Juan Zamudio with Jose Zamudio, which the Government attributes to scrivener's errors that transposed the names.[3] (Filing No. 762 at 9-10.) In any event, the transposed names and other mistakes cited by Juan Zamudio do not concern portions of the Affidavit that are materially outcome-determinative, even if they could be construed as negligent.

Juan Zamudio's final argument is that the Affidavit provides no probable cause to support an objective belief that 64 N. Tremont contained evidence of a crime. (Filing No. 745 at 11.) He asserts that a reasonably well-trained officer would have known that the search was illegal because the Affidavit alleges no nexus or necessary factual averments between the alleged criminal activity and the place to be searched. *Id.* at 11-13. The Court agrees with Juan Zamudio that the Affidavit contained substantial deficiencies, and that a reasonably well-trained officer would have known that the search was illegal despite the Magistrate Judge's authorization. There are numerous errors where Juan Zamudio is transposed with Jose Zamudio, and in some instances the transposed names change the entire outcome of who the acts are attributed to. (*See* Filing No. 762-1 at 98 ¶ 130.) There are no factual averments that drug activity occurred at Juan Zamudio's residence, or that Juan Zamudio was seen leaving his home to deliver drugs just before meeting with Rush, in a Kroger parking lot, where police saw Juan Zamudio deliver what appeared to be drugs in a

---

[3] For example, in paragraph 130 of the Affidavit, the Affiant references Target Phone 6 (Jose Zamudio's phone) and Jose's girlfriend, Maria Gonzalez. While the entire paragraph references a series of text messages involving Target Phone 6 (Jose's phone) and Jose Zamudio is explicitly referenced as the sender of multiple text messages to sell methamphetamine to Evelyn Perez within the string, the very same paragraph concludes and inexplicably reattributes all of these actions to Juan despite the Affiant referencing Jose and Jose's phone. (*See* Filing No. 762-1 at 98-99.)

basketball-sized red box.  With regards to the drug proceeds, the Affidavit does not contain any factual averments that Juan Zamudio returned to his home following any meetings with suspected drug dealers.  To the contrary, the Affidavit shows that Juan Zamudio followed up with Jose Zamudio after receiving drug proceeds.  The Affidavit (and the Government's Response) contains numerous references to Jose Zamudio's house (and no alleged drug activity related to Juan Zamudio's house), including one instance where Juan Zamudio told Bennett to come to Jose's house to pick up some marijuana and methamphetamine.  Given the deficiencies in the Affidavit, particularly the lack of nexus between Juan Zamudio's alleged criminal activities and 64 N. Tremont (and that Juan Zamudio's drug activities tied back to Jose Zamudio's residence), the good faith doctrine does not apply to the facts of this case because a reasonably well-trained officer would have known the search was illegal.  Accordingly, the evidence seized during the search must be suppressed.

## IV. CONCLUSION

The Affidavit presented to the magistrate established probable cause that Juan Zamudio was engaged in drug trafficking activities and he does not dispute the he resided at 64 N. Tremont Street. However, there is no nexus whatsoever to connect his drug activities to the residence that was searched. For the reasons set forth above, Juan Zamudio's Motion to Suppress ([Filing No. 745](#)) is **GRANTED.**  The evidence seized during the search of 64 N. Tremont Street, Indianapolis, Indiana, on November 17, 2016 is **suppressed**.

**SO ORDERED.**

Date:  3/7/2018

*[signature: Tanya Walton Pratt]*

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

John T. Tennyson
TENNYSON WIGGINGTON PLLC
jtennyson@nashville-law.com

Harold Samuel Ansell
ATTORNEY AT LAW
attorneyansell@gmail.com

Belle T. Choate
ATTORNEY AT LAW
choate@iquest.net

Adrian Bennett, USM #15487-028
Henderson County Jail
380 Borax Drive
Henderson, Kentucky  42420

Mario Garcia
BRATTAIN MINNIX GARCIA
mario@bmgindy.com

Michelle Patricia Brady
UNITED STATES ATTORNEY'S OFFICE
michelle.brady@usdoj.gov

Peter A. Blackett
UNITED STATES ATTORNEY'S OFFICE
peter.blackett@usdoj.gov